## Ex parte GOUTHRO.

(District Court, E. D. Michigan, S. D. February 21, 1924.)

No. 8361.

1. **Aliens ⬅46—Furnishing Canadian telegraph operator with pass held not to authorize exclusion.**

Evidence that a telegraph company furnished one of its Canadian operators with a railroad pass to come to this country *held* not to authorize excluding her from admission to this country, under Immigration Act Feb. 5, 1917, § 3 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 4289¼b), excluding aliens whose tickets were paid for by corporations, in view of Interstate Commerce Act, § 1, par. 7, as amended by Transportation Act Feb. 28, 1920, § 401 (Comp. St. Ann. Supp. 1923, § 8563).

2. **Aliens ⬅50—Telegraph operator held not "contract laborer," within the Immigration Act.**

A telegraph operator *held* not a "contract laborer," within Immigration Act Feb. 5, 1917, § 3 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 4289¼b), excluding from admission into the United States contract laborers induced to immigrate to this country by a promise of employment.

[Ed. Note.—For other definitions, see Words and Phrases, Second Series, Contract Laborer.]

3. **Aliens ⬅50—Purpose and scope of contract labor legislation stated; "contract laborer."**

The purpose of Immigration Act Feb. 5, 1917, § 3 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 4289¼b), excluding from admission to the United States contract laborers induced to migrate by promises of employment, is to prevent the importation of an ignorant, servile class of foreign laborers, to work at a low rate of wages, and it does not apply to persons whose work requires mental rather than manual effort as its dominant element.

4. **Evidence ⬅20(2)—Common knowledge that work of telegraph operators is mental.**

It is a matter of common knowledge, of which a court will take judicial notice, that the work ordinarily and regularly performed by telegraph operators is not manual, nor physical, but is mental.

5. **Aliens ⬅54—Evidence held not to show that petitioner entered without inspection.**

Evidence that petitioner told the immigration officer that she was going to the United States on a visit *held* not to show that she entered without inspection, in violation of Immigration Act Feb. 5, 1917, § 19 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 4289¼jj), even though that statement was false and misleading.

Habeas Corpus. In the matter of the petition of Mae E. Gouthro for a writ to test legality of petitioner's detention. Petitioner ordered discharged and released from custody.

Corliss, Leete & Moody, of Detroit, Mich., for petitioner.

Delos G. Smith, U. S. Atty., and Frederic L. Eaton, Asst. U. S. Atty., both of Detroit, Mich., opposed.

TUTTLE, District Judge. This is a habeas corpus proceeding, brought by petitioner, an alien (a Canadian), to test the legality of her detention by United States immigration inspectors under deportation proceedings which resulted in a warrant from the Second Assistant

Secretary of Labor, directing the return of said alien to Canada, the country from which she entered the United States.

The grounds on which such deportation warrant was issued, as therein stated, were: (1) That said alien's "ticket or passage was paid by a corporation, association, society, municipality or foreign government"; (2) that she "was a contract laborer at the time of her entry, having been induced, assisted, encouraged, or solicited to migrate to this country by an offer or promise of employment, or in consequence of an agreement, oral, written, or printed, express or implied, to perform labor of any kind, skilled or unskilled, in the United States"; and (3) that she "entered by means of false and misleading statements, thereby entering without inspection."

Petitioner insists that she entered this country lawfully and is entitled to remain here, and alleges that her detention and threatened deportation are unauthorized and illegal. In response to the writs of habeas corpus and certiorari, which were issued upon the filing of the petition, and addressed to and served upon the immigration inspector in charge at the port of Detroit, in this district, the latter filed his return thereto, to which was attached a transcript of the testimony taken at the hearing conducted by one of the United States immigration officials in the deportation proceedings forming the basis of the warrant referred to. The grounds for deportation as set forth in said warrant will be considered in the order in which they were there stated, as already quoted therefrom.

[1] 1. As already noted, the warrant ordering the deportation of petitioner recites that "her ticket or passage was paid by a corporation, association, society, municipality or foreign government." Section 3 of the Immigration Act of February 5, 1917 (chapter 29, 39 Statutes at Large, 875 [Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 4289¼b]), provides that:

"The following classes of aliens shall be excluded from admission into the United States: * * * Persons whose ticket or passage is paid for by any corporation, association, society, municipality or foreign government, either directly or indirectly."

Petitioner, before and at the time of her entry into the United States, was in the employ of the Western Union Telegraph Company, a New York Corporation, as a telegraph operator. She had been stationed at the cable office of said company at Sydney, Nova Scotia, and at the time of her entry was being transferred to its station in Boston. When she entered the country, at Vanceboro, Me., she was traveling on a railroad pass which had been furnished to her by one of the officials of said telegraph company, one White. The only evidence in the record on which the deportation warrant was based, in so far as this alleged ground for deportation is concerned, consisted of the following three questions and answers, appearing in the transcript of the proceedings taken at the hearing already mentioned:

"Q. Who furnished the transportation for you to come to the United States?
"A. Mr. White.
"Q. For the Western Union?
"A. Yes.
"Q. What form was that in?
"A. Passes."

Does the testimony just quoted afford any basis for the finding by the immigration officials that petitioner's ticket or passage was paid for by a corporation? It is earnestly insisted on behalf of petitioner that it does not. Paragraph 7 of section 1 of the Interstate Commerce Act, as amended by the Transportation Act (Act of February 28, 1920, c. 91, § 401; 41 Statutes at Large, 456 [Comp. St. Ann. Supp. 1923, § 8563]), expressly provides that the prohibition therein contained against the issuance of free passes "shall not be construed to prohibit the privilege of passes * * * for the * * * employees * * * of * * * telegraph, telephone and cable lines." It thus appears that the pass on which petitioner was traveling when she entered this country might lawfully have been issued by the railroad in question as a pure gratuity on its part, and without payment or consideration of any kind on the part of the Western Union Telegraph Company or of any other corporation or person. There is an entire absence of any evidence in the record tending to support a finding that payment, either in money, services, or otherwise, for this pass was made by any one. The mere fact that the telegraph company obtained the pass from the railroad and delivered it to petitioner does not constitute nor indicate any payment for such pass. The mere act of furnishing to an alien a free pass which is used for the purpose of entering this country does not constitute a violation of the Immigration Act nor justify the exclusion of such alien on that ground. It would have been easy for Congress to provide for the exclusion of aliens "whose ticket or passage is not paid for by themselves." That, however, has not been done. Congress has contented itself, in this connection, with providing for the exclusion of aliens "whose ticket or passage is paid for by any corporation," etc. The meaning of this language is plain and unambiguous, and the court cannot indulge in speculation as to whether Congress intended to use other language expressing a different meaning. The finding therefore, that the passage of petitioner was paid for, as alleged by the government, must be held to be without any basis, and insufficient in law to authorize the deportation warrant complained of.

[2] 2. The second ground on which the deportation warrant was based, as already stated, was the finding that petitioner—.

"was a contract laborer at the time of her entrance, having been induced, assisted, encouraged or solicited to migrate to this country by an offer or promise of employment, or in consequence of an agreement, oral, written or printed, express or implied, to perform labor of any kind, skilled or unskilled, in the United States."

Section 3 of the Immigration Act, as hereinbefore cited, provides that there "shall be excluded from admission into the United States," among the classes of aliens denied admission—

"persons hereinafter called contract laborers, who have been induced, assisted, encouraged, or solicited to migrate to this country by offers or promises of employment, whether such offers or promises are true or false, or in consequence of agreements, oral, written, or printed, express or implied, to perform labor in this country of any kind, skilled or unskilled: * * * Provided * * * that the provisions of this law applicable to contract labor shall not be held to exclude professional actors, artists, lecturers, singers, nurses, ministers of any religious denomination, professors for col-

leges or seminaries, persons belonging to any recognized learned profession, or persons employed as domestic servants."

It is urged by petitioner, not only that she was not a "laborer," but also that, as she entered this country for the purpose of continuing in the United States the employment in which she was already engaged in Canada prior to and continuously up to and including the time of her entry, it cannot properly be said that she was "induced, assisted, encouraged, or solicited to migrate to this country by offers or promises of employment." If petitioner be correct in the first contention just stated, the correctness of the second one is immaterial.

[3] It must now be regarded as settled that the purpose of Congress in enacting this so-called "contract labor" legislation was to prevent the importation into this country of an ignorant, servile class of foreign laborers, to work at a low rate of wages, and thus reduce other laborers engaged in like occupations to the level of the assisted immigrants, and this provision of the statute does not refer nor apply to persons whose work requires mental, rather than merely manual, effort as its dominant element. Church of Holy Trinity v. United States, 143 U. S. 457, 12 Sup. Ct. 511, 36 L. Ed. 226; United States v. Laws, 163 U. S. 258, 16 Sup. Ct. 998, 41 L. Ed. 151; Scharrenberg v. Dollar Steamship Co., 245 U. S. 122, 38 Sup. Ct. 28, 62 L. Ed. 189; Gay v. Hudson River Electric Power Co. (C. C.) 178 Fed. 499; Tatsukichi Kuwabara v. United States, 260 Fed. 104, 171 C. C. A. 140 (C. C. A. 9); United States v. Union Bank of Canada (C. C. A. 2), 262 Fed. 91, 8 A. L. R. 1438; Ex parte Aird (D. C.) 276 Fed. 954. As was remarked by the Supreme Court in the case first cited:

"It was never suggested that we had in this country a surplus of brain toilers."

[4] It is undisputed that petitioner was at the time of her entry into this country a telegraph operator. It is alleged in her petition for the writ of habeas corpus, and is not denied in the return filed thereto, that the work which petitioner was performing required "a high degree of skill and experience." Beyond the fact that petitioner was a telegraph operator, the record before the immigration officials contained no evidence as to the nature of the work which she had been performing as such telegraph operator in Canada, or which she intended to perform in that capacity in the United States. There is, therefore, at least no basis to support the finding contained in the warrant of deportation to the effect that petitioner was a contract "laborer." On the other hand, it is a matter of common knowledge, of which this court will take judicial notice, that the work ordinarily and regularly performed by telegraph operators is not manual nor physical in any proper sense, but is mental. Applying the statutory provision under consideration, properly construed, to the petitioner, I am satisfied that she was not within the scope of its prohibition and not subject to be excluded as a "contract laborer." The contention of the Government to the contrary must be overruled.

[5] 3. The third and last ground for the deportation of the petitioner, as stated in the warrant, is the finding that she "entered by means of false and misleading statements, thereby entering without inspec-

tion." The provision of the statute relied on by the government in this regard is section 19 of the Immigration Act (Act of February 5, 1917, c. 29, 39 Statutes at Large, 889 [Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 4289¼jj]), which provides, among other things, that:

"Any alien who shall have entered the United States by water at any time or place other than as designated by immigration officials, or by land at any place other than one designated as a port of entry for aliens by the Commissioner General of Immigration, or at any time not designated by immigration officials, or who enters without inspection, shall, upon the warrant of the Secretary of Labor, be taken into custody and deported."

It will be noted that all of the provisions just quoted are directed against, and obviously designed to prevent, the entry of aliens surreptitiously and without an opportunity on the part of the immigration officials to ascertain, in the manner provided by law, whether such aliens are entitled to enter this country. The only question in this connection which is material here is whether the petitioner entered the United States "without inspection."

It is undisputed that an immigration inspector boarded the train on which petitioner was traveling from Canada into the United States, and that he saw and questioned petitioner. It appears from the transcript of the testimony taken at the hearing in the deportation proceedings that the immigration officer in question inquired of petitioner as to whether she was going on a visit, and how long she was to stay, and that she stated to him that she was coming on a visit, and that she did not tell him how long she would be in the United States, "because," as she testified at said hearing, "I wasn't sure."

It is the contention of the government that the statements thus made by petitioner to the immigration inspector were false and misleading, and induced said inspector to omit further investigation into her right to enter the country, and that therefore she entered "without inspection," within the meaning of the Immigration Act. There is no evidence whatever to the effect that petitioner avoided further questions by her answers to the questions which were asked of her. Nor does it appear that any further questions would have elicited facts showing any ground for her exclusion. No such facts were developed by the searching cross-examination to which she was subjected at the hearing before the immigration officials in the deportation proceedings already mentioned and there seem to have been no grounds for the exclusion of petitioner. In the sworn traverse to the return filed in this cause, petitioner states:

That "at the time of her entry into the United States on or about the 1st of June, 1922, at Vanceboro, she was sitting in the railway coach with Jean Musgrave and that the immigration inspector inquired of Jean Musgrave if she were going into the states on a visit, to which she replied, 'Yes.' He then turned to deponent and said, 'You, too?' to which she replied, 'Yes.' He had already inquired of other girls in the same manner sitting back of deponent; that he made no other inquiry as to the details of deponent's stay, and that she asked the inspector, What about the head tax? she having the money then and there ready to pay same, and he informed deponent it was not necessary, unless she was going to remain in the States for more than six months; that he asked deponent if she would promise to go to the office and pay the head tax if she stayed more than six months, to which deponent replied that she would; that deponent did not at that time know how long a time she would remain in the United States, and whether or not

she would remain more than six months, as deponent did not know whether she would be sooner transferred in her employment, or whether she would like to reside in the United States."

Before the expiration of six months thereafter, petitioner was arrested as an alien unlawfully in this country.

No legal definition nor explanation of the meaning of the word "inspection," as used in this statute, has been brought to the attention of this court, and I have been unable to find any. The Immigration Act provides in general terms that "the inspection" of aliens seeking admission shall be "conducted by immigrant inspectors," and such inspectors are authorized to "board and search for aliens any vessel, railway car, or any other conveyance, or vehicle in which they believe aliens are being brought into the United States." Section 16 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 4289¼i). Provision is also made for the taking from such aliens of sworn statements concerning such information as will aid the immigration officials in determining whether the aliens belong to any of the excluded classes and for that purpose immigrant inspectors are empowered to administer oaths and to take and consider evidence as to the right of any alien to enter the United States. It is provided that any alien "who may not appear to the examining immigrant inspector at the port of arrival" to be entitled to land "shall be detained for examination in relation thereto by a board of special inquiry."

While it does not appear whether or not petitioner was examined on oath by the inspector who questioned her on her arrival, I see no ground for holding that such an examination under oath is a necessary, or even a usual, part of an "inspection," within the meaning of this statute. The act nowhere so provides, and it is well known that aliens are constantly entering the United States from Canada, who are observed and questioned by the immigration inspectors at ferry docks and on railroad trains, without their being sworn or examined under oath. If such an inspector is afforded a full and fair opportunity to make such an inspection of arriving aliens as he may deem sufficient, it cannot, in my opinion, be properly said that any such alien has entered "without inspection," even though it later develops that said inspector has not made as complete or successful an inspection as he could or should have made, especially in view of the discretion vested in immigration inspectors as to the nature and extent of the inspection required. In the present case, even if the traverse to the return, as hereinbefore quoted, be ignored, there is nothing to indicate that petitioner sought to avoid such inspection as the examining inspector desired to make. The legal presumption, in the absence of any evidence to the contrary, must be that he properly performed the duties required of him and that what he did constituted whatever inspection was required under the circumstances. Even if the petitioner made false and misleading statements to him, he was not obliged to accept them as true, or to refrain from such further questions and investigation as would enable him to reach a proper conclusion as to the right of petitioner to enter the country. If a witness in court makes false statements on cross-examination, and thereby induces cross-examining counsel to forego

further questioning, such a witness cannot be said to have testified "without cross-examination." The real complaint of the government in this connection is that petitioner made false and misleading statements to the inspector. While, however, that might have been, and perhaps should be, made a ground for the exclusion of aliens, Congress has not yet seen fit to so enact. I reach the conclusion that, whether or not petitioner made false and misleading statements to the inspector, as alleged, the contention of the government that petitioner entered without inspection is without legal basis and cannot be sustained. Ex parte Lalime (D. C.) 244 Fed. 279; Ex parte Guest (D. C.) 287 Fed. 884.

It results that the warrant of deportation pursuant to which petitioner is detained must be held to have been issued without jurisdiction, and therefore to be void, and petitioner must be discharged and released from custody thereunder. An order will be entered accordingly.